**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5670-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOHN BLOCKER, a/k/a
JOHN JACOBS, KHALID
JOYNER, KHALID JACOBS,
and TREVOR JACOBS,

     Defendant-Appellant.

_____

> Argued February 14, 2022 – Decided July 20, 2022
>
> Before Judges Messano, Accurso and Enright.
>
> On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 16-03-0254.
>
> James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; James K. Smith, Jr., of counsel and on the briefs).
>
> Sarah C. Hunt, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Acting

Attorney General, attorney; Sarah C. Hunt, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

On January 20, 2006, Juan Cuevas, Sr., was brutally tortured and killed in the bedroom of his Washington Township home by four intruders as his three children — captives in a nearby bedroom — heard their father's screams. The homicide remained unsolved until nearly a decade later, when defendant John Blocker was arrested and charged.

A Gloucester County grand jury indicted defendant for murder, felony murder during "a robbery and/or kidnapping," armed burglary, armed robbery, and three counts of kidnapping — one for each of the three Cuevas children — "with the purpose of holding [them] for ransom or reward or a shield or hostage." Following a twelve-day trial at which the three children testified but were never asked to identify defendant, the jury convicted defendant of the lesser-included offense of aggravated manslaughter and all other charges.

The judge granted the State's motion to sentence defendant as a persistent offender, see N.J.S.A. 2C:44-3(a). After denying defendant's motion for a new trial and ordering appropriate mergers, the judge imposed a 50-year term of imprisonment on the felony-murder conviction, and consecutive 15, 20, and 30-

2

year terms on the three kidnapping convictions, one for each child, for an aggregate 115-year term of imprisonment, with a 97-year, 9-month period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2. This appeal followed.

Defendant raises the following points for our consideration:

POINT I

THE TRIAL JUDGE SHOULD HAVE ENTERED A JUDGMENT OF ACQUITTAL ON THE KIDNAPPING COUNTS ON HIS OWN INITIATIVE PURSUANT TO RULE 3:18-1 BECAUSE THERE WAS NO EVIDENCE THAT THE CHILDREN WERE UNLAWFULLY CONFINED "WITH THE PURPOSE OF HOLDING [THEM] FOR RANSOM OR REWARD OR AS A SHIELD OR HOSTAGE." (Not raised below)[1]

POINT II

THE JUDGE'S RULING THAT DEFENDANT COULD BE IMPEACHED WITH ALL OF HIS PRIOR CONVICTIONS, MOST OF WHICH WERE MORE THAN [TWENTY] YEARS OLD, WAS CONTRARY TO RULE 609(b), AND PRECLUDED DEFENDANT FROM TESTIFYING ON HIS OWN BEHALF, THUS DENYING HIM A FAIR TRIAL.

---

[1] The alteration is in the original. We have eliminated all subpoints contained in defendant's brief.

A-5670-18

POINT III

GIVEN THE JURY'S VERDICTS THAT DEFENDANT WAS <u>NOT</u> GUILTY OF PURPOSEFUL MURDER AND DID <u>NOT</u> COMMIT THE CRIME BY HIS OWN CONDUCT, THE IMPOSITION OF A [NINETY-SEVEN]-YEAR PAROLE DISQUALIFIER WAS SO WILDLY EXCESSIVE AS TO SHOCK THE CONSCIENCE, AND WAS THE RESULT OF MULTIPLE SENTENCING ERRORS, INCLUDING THE FAILURE TO GIVE PROPER CONSIDERATION TO THE <u>YARBOUGH</u>[2] FACTORS, OR THE "REAL TIME" CONSEQUENCES OF THE SENTENCE.

In a pro se supplemental brief, defendant argues:

POINT I

THE TRIAL COURT IMPROPERLY DENIED DEFENDANT'S MOTION FOR SUPPRESSION OF EVIDENCE, VIOLATING DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

Having considered the arguments in light of the record and applicable legal principles, we are compelled to reverse.

I.

We summarize the trial evidence only as necessary to address the issues raised.

---

[2] <u>State v. Yarbough</u>, 100 N.J. 627, 643–44 (1985).

In the early afternoon of January 20, 2006, eighteen-year-old Juan Cuevas Jr., known as Johnny, was home from school cleaning his car in front of the house while other members of the Cuevas family were elsewhere.[3] Four men arrived in a van, pushed Johnny to the ground, dragged him into the house, and forced him upstairs to his parents' bedroom. They demanded to know where was "the money." Johnny told them about a safe under his parents' bed where his father kept coins, jewelry, and "certificates." Unsatisfied, the men tied Johnny's hands behind him, put a towel over his head, and placed him in the bathtub in his parents' bathroom as they ransacked the Cuevas home. They periodically told Johnny they knew his father and knew there was money in the house. Johnny realized the men were armed. Over the next two-and-one-half hours, he remained restrained in the bathtub. At one point, he heard one man tell another, "[L]et's just pop him and leave."

Just then, Johnny's nineteen-year-old sister Vanessa arrived home and was immediately confronted by a man wearing gloves and a ski mask. At gunpoint, he forced Vanessa upstairs to her bedroom. Two men tied her up, threatened her, and demanded to know where the money was and when her father was due

---

[3] To avoid confusion, we sometimes use first names for the members of the Cuevas family. We intend no disrespect by this informality.

A-5670-18

home.  Around 3 p.m., fourteen-year-old Jeremy arrived home from school.  The masked men assaulted him, tied him up, and began questioning him about his father's autobody shop in Philadelphia.  They again demanded to know where the money was kept in the house.  While they continued to ransack the house, the men put all three children in Vanessa's room and proceeded to wait for Juan Sr.  The children could hear them eating and drinking food from the kitchen, and they smelled the assailants' cigarette smoke throughout the house.

When Juan Sr. arrived home, a fight ensued between him and the intruders, until the men told Juan Sr. they had his children.  They threatened the children's lives if Juan Sr. did not give them the money they demanded.  The assailants brought Juan Sr. into his bedroom, where the children could hear the men torturing him for nearly an hour.  At one point, the men brought Vanessa to her father, who was tied-up and badly beaten.  She saw duffel bags filled with the family's belongings and an iron.  Vanessa knew the strange smell in the room meant the men used it to burn Juan Sr.  Eventually, the men brought Vanessa back to her room with her siblings.  When the children heard their father's screams stop, they knew the men had left the house.

After freeing themselves, the children called 9-1-1 and administered CPR to Juan Sr.  However, the medical personnel who responded pronounced Juan

A-5670-18

Sr. dead at the scene. The medical examiner determined Juan Sr. died from blunt force trauma to the head.

Police processed the scene and interviewed the children. It suffices to say that while the four men sometimes took off their masks and gloves, and the children were able to describe them and the clothing they wore in general terms, none of the children could positively identify any of the four assailants through photographic identification procedures. Investigators were able to develop a composite sketch of one of the intruders. Investigators also tracked down leads on dozens of suspects, although defendant's name never surfaced throughout the investigation. One suspect, the alleged leader of a Philadelphia-based criminal gang, was convicted for his involvement in a similar home invasion one month earlier in a nearby town.

Police dusted the scene for fingerprints and seized various items for comparison and DNA analysis. An orange juice container recovered from a second-floor bathroom and a cigarette butt recovered from the kitchen floor revealed the same male DNA on both items, but the national database did not produce a match. The Cuevas case remained unsolved for years.

In 2015, authorities were able to match a fingerprint found on an orange juice container retrieved from the kitchen of the Cuevas home when

investigators processed the scene. It was defendant's thumbprint. The Cuevas children had never heard of defendant, and none of Juan Sr.'s friends and acquaintances knew defendant.

Investigators were able to identify defendant's girlfriend, Cherie Hawk, and located her home address. They devised a pretext to obtain a specimen of defendant's DNA. Detective William McCusker of the Philadelphia Police Department assigned to the FBI Violent Crimes Task Force was working with Gloucester County authorities and drove to Hawk's home. McCusker convinced defendant to accompany him to FBI offices in the federal building in Philadelphia. McCusker knew a weapons offense against defendant had been dismissed in 2006, and McCusker asked defendant for help regarding an "old gun job" by providing any information regarding the weapon. While in FBI offices, defendant smoked and discarded a cigarette, and investigators obtained DNA from the discarded portion. It was consistent with DNA found on the orange juice container retrieved by investigators from the second-floor bathroom in the Cuevas home and the cigarette butt from the kitchen, but a buccal swab sample was necessary to provide more conclusive results.

Defendant was arrested for the homicide in November 2015 in Philadelphia and extradited to New Jersey. After securing a court order,

investigators obtained a buccal swab from defendant in February 2016 and conducted further DNA analysis. They confirmed the DNA on the orange juice container from the second-floor bathroom matched defendant's DNA, and additionally, investigators matched the buccal sample to DNA found on the orange juice container in the kitchen and the cigarette butt found on the kitchen floor.

## II.

Defendant moved pre-trial to suppress the discarded portion of the cigarette McCusker and his colleagues obtained during the pretextual 2015 FBI interview in Philadelphia, arguing it was the fruit of an unlawful detention and interrogation. Defendant also contended that because the interview was not recorded pursuant to Rule 3:17, any evidence seized following the interview should be suppressed.

The judge held an evidentiary hearing on defendant's motion. McCusker testified, as did defendant, his sister, and Hawk. The judge specifically credited McCusker's testimony and found the defense testimony was not credible. Without specifically deciding, the judge concluded it did not matter whether the events were a "field inquiry" or an "investigative detention." He found investigators had a reasonable suspicion of defendant's involvement in the

A-5670-18

Cuevas crimes before arriving at Hawk's home.  Therefore, the judge concluded "[d]efendant was lawfully brought to FBI headquarters in Philadelphia."

The judge rejected defendant's claim that the seizure of the cigarette was unlawful because McCusker never administered Miranda[4] rights to defendant. He concluded Miranda did not apply because the cigarette was "nontestimonial physical evidence," and he also rejected defendant's argument based on an alleged violation of Rule 3:17.  Lastly, the judge determined the "inevitable discovery exception" applied, reasoning that even if the court suppressed the cigarette recovered after the pretextual interview, investigators had sufficient probable cause to arrest defendant and would have eventually obtained the buccal swab for comparison to evidence recovered at the Cuevas home.

In his pro se brief, defendant largely reiterates the arguments made to the trial judge regarding this issue.  In particular, he contends the evidence at the hearing demonstrated neither reasonable suspicion justifying an investigative detention nor that he voluntarily accompanied McCusker.  We reject the contention and affirm denial of defendant's motion to suppress for reasons different than those expressed by the trial judge.  See, e.g., Hayes v. Delamotte, 231 N.J. 373, 387 (2018) ("not[ing] that 'it is well-settled that appeals are taken

---

[4]  Miranda v. Arizona, 384 U.S. 436 (1966).

from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion.'" (quoting Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001))).

In reviewing the denial of a motion to suppress, we defer to the trial judge's factual "findings [if] 'supported by sufficient credible evidence.'" State v. Radel, 249 N.J. 469, 493 (2022) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). "We defer to those findings of fact because they 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Hubbard, 222 N.J. 249, 262 (2015) (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

McCusker testified that he called defendant, asked him to come out of Hawk's home, and, when he did, McCusker invited him into his truck. He did not search defendant for weapons and had him sit in the front seat. McCusker specifically asked defendant if it was acceptable to speak at the FBI offices. Defendant agreed, if McCusker would take him to his job after the interview. At the office, defendant willingly discussed the dismissed charge and smoked a cigarette in the interview room. The judge found all this testimony credible, and specifically rejected defendant's contrary version of events.

Under these circumstances, the encounter between McCusker and defendant was more in the nature of a field inquiry than an investigative detention. A field inquiry consists of questions that "[are] not harassing, overbearing, or accusatory in nature," State v. Pineiro, 181 N.J. 13, 20 (2004) (alteration in original) (quoting State v. Nishina, 175 N.J. 502, 510 (2003)). "[T]he individual approached 'need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.'" State v. Privott, 203 N.J. 16, 24 (2010) (quoting State v. Maryland, 167 N.J. 471, 483 (2001)).

A field inquiry, as when a "police officer approaches an individual and asks 'if [the person] is willing to answer some questions'" is not a detention. Pineiro, 181 N.J. at 20 (alteration in original) (quoting Nishina, 175 N.J. at 510). Because a field inquiry is not a detention, police may question someone without probable cause or even reasonable suspicion of criminal activity. State v. Adubato, 420 N.J. Super. 167, 177–78 (App. Div. 2011) (citing State v. Rodriguez, 172 N.J. 117, 126 (2002)). In sum, the seizure of defendant's discarded cigarette was not the fruit of an unlawful detention, and the motion to suppress was properly denied.

12

To the extent we have not otherwise addressed them, defendant's arguments regarding denial of the motion lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

III.

For the first time on appeal, defendant contends the judge should have sua sponte dismissed the three kidnapping charges because the State failed to produce any evidence that the children were held "for ransom or reward or [as] a shield or hostage."  We reject the argument.

"Our law recognizes two forms of kidnapping, . . . . N.J.S.A. 2C:13-1(a) addresses holding a victim for ransom, reward[,] or as a hostage, while N.J.S.A. 2C:13-1(b) criminalizes 'other purposes' or 'non-ransom kidnapping.'"  State v. Jackson, 211 N.J. 394, 414 (2012).  Here, the indictment charged defendant with kidnapping under subsection (a), which provides: "A person is guilty of kidnapping if he unlawfully removes another from the place where he is found or if he unlawfully confines another with the purpose of holding that person for ransom or reward or as a shield or hostage." N.J.S.A. 2C:13-1(a).  The terms "ransom" and "hostage" are undefined in the Criminal Code.

At the charge conference, the prosecutor said the evidence supported a finding that the children were held for ransom or as hostages.  Although defense

counsel disagreed there was sufficient evidence the children were held for ransom, he never argued the evidence was insufficient to support a finding beyond a reasonable doubt that they were held as hostages. When the judge asked counsel to review the proposed charge, defense counsel had no objections.

Consistent with Model Jury Charges (Criminal), "Kidnapping (N.J.S.A. 2C:13-1(a))" (rev. Oct. 6, 2014), the judge instructed the jury:

> The statute further defines the crime of kidnapping as an unlawful confinement of a person. The confinement need not be for a specific period of time, so long as the confinement was unlawful. That is, accomplished by force, threat, or deception and for the purpose of gaining ransom or using the victim as a shield or hostage.
>
> You will note that I've also used the term "ransom," "shield," and "hostage." "Ransom" is defined as the money, price, or consideration paid or demanded for redemption of a captive person. That is, a payment to secure the release of the captive person. One use[s] another person as a shield when by force he placed that person in a position of danger in order to protect himself. "Hostage" implies the unlawful taking, restraining, or confining of a person with the . . . intent . . . that the person confined be held as security to ensure that a third person either performs some actions or refrains from performing some action.[5]

---

[5] There was no evidence to support a finding that the assailants used the children as shields, so it is unclear why the judge included instructions on the issue. Nevertheless, defendant does not argue including this part of the model charge in the final jury instructions, or including confining the children "for ransom or

A-5670-18

In addition to his claim of insufficient evidence, defendant argues Juan Sr. was himself a victim and could not be considered the "third person" whose action or inaction the assailants expected to compel by confining the children.

Rule 3:18-1 permits the court on defendant's motion or "its own initiative" to consider the sufficiency of the evidence. "In determining whether . . . the State presented sufficient evidence for the case to go to the jury, 'we apply a de novo standard of review.'" State v. Cruz-Pena, 243 N.J. 342, 348 (2020) (quoting State v. Williams, 218 N.J. 576, 593–94 (2014)). "We must determine whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." Williams, 218 N.J. at 594 (citing State v. Reyes, 50 N.J. 454, 458–59 (1967)).

Obviously, the terms ransom and hostage are related. The payment of a ransom implies the anticipated release of someone being held as a hostage. A person holding a hostage, however, need not intend to compel another to make a payment; as the model charge clearly states, a hostage may be held to compel

---

as a shield or hostage" on the verdict sheet, was plain error. We therefore do not consider it.

another to take or refrain from taking action, which need not involve the payment of anything of value.

The reasonable inferences from the testimony of the children, which we only briefly summarized above, permitted the jury to conclude beyond a reasonable doubt the assailants were holding the children as hostages to convince Juan Sr. to part with money the assailants believed he had hidden in the house. Defendant's argument that Juan Sr. could not be the "third person" referenced in the model charge's definition of "ransom" because he was a victim himself, is specious. Juan Sr. was not the victim of the kidnapping. None of the out-of-state decisions cited by defendant compel a different conclusion. To the extent we have not otherwise addressed them, defendant's other arguments on this point lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

## IV.

Prior to the State resting, the judge conducted a Sands/Brunson[6] hearing to determine if the prosecutor could introduce evidence of defendant's six prior Pennsylvania criminal convictions for impeachment purposes under N.J.R.E. 609 (the Rule) if defendant testified. Defendant's first three convictions

---

[6] State v. Sands, 76 N.J. 127, 144–45 (1978); State v. Brunson, 132 N.J. 377, 390–91 (1993).

occurred on June 19, 1992.[7]  His fourth conviction, from July 20, 1993, was for conspiracy to commit robbery and robbery, second and first-degree felonies respectively; defendant was sentenced to a prison term of between two and five years.  Defendant's fifth conviction, from August 31, 1999, for carrying a firearm in public and carrying a firearm without a license, led to a prison term of between eighteen and thirty-six months.  Defendant's sixth conviction for assault, classified as a second-degree misdemeanor, occurred nearly fourteen years later, on April 15, 2013, and resulted in a probationary sentence.[8]  The State proposed that all six convictions would be sanitized to reflect only their date of the offense. its degree, and the sentence defendant received. Defense

---

[7]  The offenses underlying defendant's first, second, and third convictions were committed on separate dates, but the judgment of conviction was entered on a single date.  The first conviction was for carrying a firearm on September 26, 1991, a first-degree misdemeanor, for which defendant was sentenced to a two-year term of probation.  The second was for theft by receiving stolen property on May 5, 1991, a third-degree felony, for which he was sentenced to a three-year term of probation.  The third conviction was for the unauthorized use of a motor vehicle and theft by receiving stolen property on January 23, 1992, both felonies, for which defendant was sentenced to a prison term between eleven months-fifteen days and twenty-three months, to be followed by a two-year term of probation.

[8]  Citing State v. G.P.N., the prosecutor argued this misdemeanor simple assault conviction could be considered a prior criminal conviction under N.J.S.A. 2C:44-4(c) because it carried a maximum sentence of two years imprisonment in Pennsylvania.  321 N.J. Super. 172, 175–76 (App. Div. 1999).  Defendant does not contest that assertion on appeal.

counsel argued that except for the 2013 conviction, defendant's prior convictions were too remote and therefore inadmissible.

Citing Sands, Brunson, and our decision in State v. Lagares, 247 N.J. Super. 392, 396 (App. Div. 1991), rev'd on other grnds., 127 N.J. 20 (1992), the judge noted, "Ordinar[il]y evidence of a prior conviction should be admitted and the burden of proof to justify exclusion rests on the defense." The judge said, "[t]he key to exclusion is remoteness," not "determined by the passage of time alone," but after consideration of other factors like "[t]he nature of the convictions," which is "a significant factor." The judge found it "appropriate . . . to consider intervening convictions between the past conviction and the crime for which defendant is being tried." If a defendant "has an extensive prior criminal record . . . his burden should be heavier . . . in an attempt to exclude all such evidence." The judge said, "whether the defendant testifies or not is purely his decision."

After reviewing the six prior convictions, the judge said:

> We're now to commence trial in 2019. Bridging the gap is a colloquial term for the issue of whether or not through the course of time the intervening arrests bring in the later convictions . . . evidencing a continued period of criminality on the part of the defendant.
>
> . . . .

> The question . . . here is whether or not the gap between the 1999, the number five conviction, and number six, the 2013 simple assault, is bridged in a meaningful way. Not just simply looking at the ten years that [N.J.R.E.] 609 calls for us to look at, but based upon a review of the totality of the defendant's contact with the criminal justice system.
>
> . . . .
>
> In considering the totality of the defendant's criminal history, the Court finds that the period between '99 and that conviction and the sentence [defendant] received is sufficiently bridged to the 2013 conviction of simple assault such that the entirety of the defendant's criminal history can come before the jury for a determination of credibility.
>
> [(Emphasis added).]

Defense counsel sought clarification, noting that amendments to the Rule made clear the State had the burden of proof regarding any conviction that was more than ten years' old, and the decision in Lagares predated 1993 amendments to the Rule. The judge agreed the Rule had been modified and it was the State's "burden . . . to put forth the appropriateness of each of the convictions and establish each of the convictions." He concluded the State had "given [him] all the information that [he had]," and he was not asking "the defense[] for anything to support why [the prior convictions] should not be admitted." (emphasis added).

Defendant elected not to testify. In summation, defense counsel argued defendant did not match the physical descriptions given by the children of the assailants. He also highlighted the investigation of the criminal gang from Philadelphia and its leader's conviction of a nearby home invasion, as well as another gang member's resemblance to the composite drawing. Counsel noted investigators assembled a list of individuals affiliated with the gang, but defendant's name was never on that list.

In trying to downplay the significance of the fingerprint and DNA evidence, defense counsel noted expert opinion could and should be rejected in this case. He questioned why it was not until 2015, when the State secured defendant's buccal swab, that the State matched the forensic evidence to defendant. Defense counsel suggested DNA could be transferred onto physical evidence, and even though investigators submitted evidence directly related to the crimes for analysis, for example the cords used to bind the victims, defendant's DNA was allegedly only located on items that had nothing to do with the crimes. He urged the jury to consider defendant may have been in the Cuevas residence on a date other than when the crimes occurred.

The jury deliberated for a short time on Thursday, May 2, 2019, before sending the judge a note asking for further instructions. With the agreement of

counsel, the judge told the jurors to return on Monday, May 6, at which time he provided them with the instructions they requested and told them to continue deliberations. We have no additional transcripts of proceedings until May 13, 2019, when the judge dealt with some juror issues and there was some playback of testimony. On May 14, 2019, at a time undisclosed by the transcript, the jury returned the verdicts we set out above.

At sentencing, defendant moved for a new trial arguing the judge erred in ruling the State could introduce all of defendant's prior convictions. Counsel also contended the judge hamstrung his third-party guilt defense by limiting testimony about Cuevas Sr.'s prior drug conviction and portions of the investigation that intimated the assailants were aware Juan Sr. was receiving a large shipment of drugs. Defense counsel also contended the ruling regarding defendant's prior convictions "prevented [his] client from taking the stand and testifying on his behalf," specifically that he was "in the house to purchase drugs from the alleged victim," which explained the presence of defendant's DNA and fingerprint.

The judge concluded defendant presented no new arguments and the rulings made at trial did not "preclude[] the defendant from taking the stand and placing that defense on the record." The judge examined what "defendant was

21

attempting to do through [the proffered] testimony," i.e., testify "he was a drug dealer . . . at the victim's home to conduct a drug transaction." The judge reasoned: "So, what's the difference if this criminal record came forth before the jury?" He denied the motion for a new trial and sentenced defendant.

Before us, defendant argues the judge misapplied N.J.R.E. 609(b) and erroneously ruled the State could impeach defendant with all six prior criminal convictions. He contends no published decision has permitted the State to use convictions that were more than twenty years old to impeach a defendant's credibility as a witness. Defendant further contends this ruling effectively kept him from testifying and explaining why the only inculpatory evidence in the case — his fingerprint and DNA — were found at the Cuevas home.

We apply a deferential standard of review to the court's decision to permit the State to use prior criminal convictions for impeachment. State v. T.J.M., 220 N.J. 220, 234 (2015). "However, we do not defer to a ruling that is based on a mistaken interpretation of an evidence rule, or that misapplies the rule." State v. R.J.M., 453 N.J. Super. 261, 266 (App. Div. 2018). We agree the judge mistakenly exercised his discretion by ruling the State could use all six prior criminal convictions to impeach defendant if he chose to testify.

A-5670-18

Prior to 2014, the Rule presumptively admitted prior criminal convictions for impeachment purposes "unless excluded by the judge as remote or for other causes." State v. Harris, 209 N.J. 431, 442 (2012) (quoting N.J.R.E. 609 (2012)). The Court in Harris recognized a significant difference between the Rule and the Federal Rules of Evidence (F.R.E.) 609, which limited the use of any conviction that was more than ten years old. Id. at 444. The Court referred "[t]he question of whether N.J.R.E. 609 should be modified . . . to the Supreme Court Committee on Evidence." Id. at 445.

The Committee on the Rules of Evidence (the Committee) recommended significant changes to the Rule, which were subsequently adopted by the Court effective July 1, 2014, and remain largely unchanged since.[9] See Biunno, Weisbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 609 (2021–22). Under its current iteration, any witness's credibility may be presumptively impeached through prior convictions under subsection (a) of the Rule, subject only to exclusion under N.J.R.E. 403 or subsection (b).

---

[9] The Court adopted minor "restyling" amendments to the Rules of Evidence effective July 1, 2020, after the trial in this appeal. The effect of those amendments are not significant to our analysis, so we use the current version of the Rule throughout this opinion.

Admission of a conviction more than ten years old triggers a different analysis under subsection (b), which provides:

> Use of Prior Conviction Evidence After Ten Years.
>
> (1) If, on the date the trial begins, more than ten years have passed since the witness's conviction for a crime . . . then evidence of the conviction is admissible only <u>if the court determines that its probative value outweighs its prejudicial effect, with the proponent of that evidence having the burden of proof</u>.
>
> (2) In determining whether the evidence of a conviction is admissible under subparagraph (b)(1) of this rule, the court may consider:
>
>> (i) whether there are intervening convictions for crimes or offenses, and if so, the number, nature, and seriousness of those crimes or offenses,
>>
>> (ii) whether the conviction involved a crime of dishonesty, lack of veracity or fraud,
>>
>> (iii) how remote the conviction is in time,
>>
>> (iv) the seriousness of the crime.
>
> [N.J.R.E. 609(b) (emphases added).]

"However, making findings as to those four factors is not enough. The court must then engage in the weighing process under (b)(1), to determine whether the State has carried its burden of proving that evidence of the remote conviction

24

would not be more prejudicial than probative."  R.J.M., 453 N.J. Super. at 270 (citing N.J.R.E. 609 (b)(1)).

Here, when the State first made the proffer, the judge's analysis was clearly mistaken because he applied a presumption of admissibility to convictions more than twenty years in the past, and he mistakenly allocated the burden to exclude the convictions from 1992, 1993, and 1999 to defendant.  The judge corrected himself when defense counsel reminded him the Rule placed the burden on the State to justify admissibility of a conviction that was more than ten years old.

Since all but the 2013 simple assault conviction were subject to subsection (b) of the Rule because they were more than ten years old when the trial began, the judge was required to first determine if the State, as proponent of the evidence, demonstrated the probative value of each conviction from 1992, 1993, and 1999 "outweigh[ed] its prejudicial effect."  N.J.R.E. 609(b)(1).  The judge never made such a finding.  Thus, even though the judge properly reallocated the burden to the State, nothing reflects his understanding of the actual burden the State was required to shoulder.[10]

---

[10]  Earlier, the judge said a prior conviction should be admitted "[u]nless . . . the [c]ourt finds that it's probative force because of its remoteness . . . will create undue prejudice."

In making that determination, the judge's discretion should have been guided by the non-exhaustive list of factors "the court may consider" contained in N.J.R.E. 609(b)(2), the first of which is "whether there are intervening convictions for crimes or offenses." N.J.R.E. 609(b)(2)(i). The judge referred to this by the colloquial term, "[b]ridging the gap."

The concept has its origin in <u>Sands</u>, decided at a time when the Court, construing then-existing N.J.R.E. 4, said:

> Ordinarily evidence of prior convictions should be admitted and the burden of proof to justify exclusion rests on the defendant.
>
> The key to exclusion is remoteness. Remoteness cannot ordinarily be determined by the passage of time alone. The nature of the convictions will probably be a significant factor. . . . Moreover, it is appropriate for the trial court in exercising its discretion to consider <u>intervening convictions between the past conviction and the crime for which the defendant is being tried</u>. When a defendant has an extensive prior criminal record, indicating that he has contempt for the bounds of behavior placed on all citizens, his burden should be a heavy one in attempting to exclude all such evidence.
>
> [76 N.J. at 144–45 (emphasis added).]

Here, the gap to be bridged was the twenty years between the 1999 conviction and the 2019 trial. The only intervening conviction was the 2013 conviction for simple assault, which defendant conceded was admissible if he testified.

26

However, that was not how the judge saw it. As noted, he explained: "The question . . . here is whether or not the gap between the 1999, the number five conviction, and number six, the 2013 simple assault, is bridged in a meaningful way." This was clearly error.

The Rule also instructs the judge to consider "the number, nature, and seriousness of those [intervening] crimes." N.J.R.E. 609(b)(2)(i). Here, there was only one intervening crime between 1999 and the start of trial, and that was the simple assault conviction in 2013 which, despite defendant's prior criminal convictions, resulted in the Pennsylvania court imposing a probationary sentence. None of defendant's convictions in the 1990s were for crimes "involv[ing] . . . dishonesty, lack of veracity, or fraud," and, as already noted, the last of those convictions was entered twenty years prior to the start of defendant's trial. N.J.R.E. 609(b)(2)(ii)[11] and (b)(2)(iii). Undoubtedly, some,

---

[11] In recommending the 2014 amendments to the Rule, the Committee specifically decided not to "demarcate[e] which crimes are crimes of dishonesty." 2011-2013 Report of the Supreme Court Committee on the Rules of Evidence, March 15, 2013, at 5. However, in construing similar language in F.R.E. 609 permitting impeachment of a witness with a conviction of a crime less than ten years old involving a "dishonest act or false statement," F.R.E. 609(a)(2), the Third Circuit concluded such crimes involve "communicative or expressive dishonesty," and robbery was not such a crime, Walker v. Horn, 385 F.3d 321, 334 (3d Cir. 2004).

but not all, of defendant's convictions from the 1990s were for serious crimes and resulted in prison terms. N.J.R.E. 609(b)(2)(iv).

We are firmly convinced that proper application of the Rule should have resulted in the exclusion for impeachment purposes of all but defendant's 2013 simple assault conviction had defendant testified at trial. That conclusion, however, does not finish our inquiry. We must consider whether the error was harmless. State v. Hedgespeth, 249 N.J. 234, 247 (2021).

We cannot re-trace more capably than Justice LaVecchia the jurisprudential path our Court has followed in rejecting United States Supreme Court precedent and concluding a defendant's decision not to testify because of an adverse ruling under the Rule is reviewable under the harmless error standard. Id. at 248–50.[12] As the Court reiterated in Hedgespeth, "[T]here can be

_____

[12] In Luce v. United States, the Supreme Court held "that to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." 469 U.S. 38, 43 (1984). Among other reasons, the Court noted "[r]equiring that a defendant testify in order to preserve Rule 609(a) claims will enable the reviewing court to determine the impact any erroneous impeachment may have had in light of the record as a whole." Id. at 42.

Several state courts have similarly restricted appellate review of trial court rulings admitting a defendant's prior convictions for impeachment purposes when the defendant has elected not to testify at trial. See, e.g., People v. Patrick, 908 N.E.2d 1, 11 (Ill. 2009); State v. Smyers, 86 P.3d 370, 374 (Ariz. 2004); State v. Raydo, 713 So. 2d 996, 1000 (Fla. 1998); People v. Sims, 853 P.2d 992,

situations, <u>although likely unusual</u>, in which an erroneous N.J.R.E. 609 ruling may be deemed harmless even if that ruling resulted in the defendant's deciding not to testify." <u>Id.</u> at 250 (emphasis added) (citing <u>State v. Whitehead</u>, 104 N.J. 353, 359–60 (1986)).

In <u>Hedgespeth</u>, police officers on surveillance observed the defendant in possession of gun and radioed his description to other officers. 249 N.J. at 240–41. Those officers apprehended defendant and retrieved a gun, but the surveillance team officers did not go to the scene and no fingerprints were found on the gun or its magazine of ammunition. <u>Id.</u> at 241. At the 2017 trial, over the defendant's objection based on remoteness, the trial judge admitted the defendant's prior convictions from 2001 and 2005 for drug offenses. <u>Id.</u> at 242. The defendant decided not to testify, although he disputed the facts in the

---

1024 (Cal. 1993); <u>People v. Finley</u>, 431 N.W.2d 19, 27 (Mich. 1988); <u>State v. Gentry</u>, 747 P.2d 1032, 1036 (Utah 1987); <u>State v. Harrell</u>, 506 A.2d 1041, 1045–46 (Conn. 1986); <u>State v. Glenn</u>, 330 S.E.2d 285, 286 (S.C. 1985); <u>State v. Means</u>, 363 N.W.2d 565, 569 (S.D. 1985); <u>Yanez v. State</u>, 187 S.W.3d 724, 734 (Tex. App. 2006); <u>Reed v. Commonwealth</u>, 366 S.E.2d 274, 277 (Va. Ct. App. 1988); <u>State v. Garza</u>, 704 P.2d 944, 949 (Idaho Ct. App. 1985).

As we note, our Court has spoken with clarity and held that a defendant's election not to testify does not foreclose appellate review of the trial judge's evidentiary decision regarding the admission of prior criminal convictions for impeachment purposes.

officers' testimony during colloquy with the judge regarding that decision. Id. at 243.

On appeal, we concluded admitting the defendant's prior convictions was error, but we also determined the error was harmless. Id. at 244 (citing State v. Hedgespeth, 464 N.J. Super. 421, 437–38 (App. Div. 2020)). The Court rejected the defendant's argument that "an erroneous ruling that pushes a criminal defendant not to testify can never be harmless," id. at 247, and instead reaffirmed "that in limine N.J.R.E. 609 rulings shall continue to be reviewed under the harmless-error standard," id. at 252. The Court said, "To determine whether admission of evidence constitutes harmless error, the relevant inquiry is whether the purported error 'is of such a nature as to have been clearly capable of producing an unjust result.'" Ibid. (emphasis added) (quoting State v. Kuchera, 198 N.J. 482, 501 (2009)).

We note, however, the effect of the trial court's ruling in Hedgespeth was not the erroneous admission of evidence before the jury. Indeed, the Court seemingly recognized this distinction immediately thereafter by positing the issue in Hedgespeth as whether "the jury's failure to hear defendant's testimony could have produced an unjust result." Ibid. (emphasis added). In other circumstances, the Court has recognized the "[e]xclusion of testimony . . . which

30

is central to a defendant's claim or defense, 'if otherwise admissible, cannot be held to be harmless error.'" State v. Scott, 229 N.J. 469, 484 (2017) (quoting State v. Kelly, 97 N.J. 178, 202–03 (1984)). And, in State v. R.Y., the Court held the exclusion of statements made by the victim to another witness was not "harmless error," because it contradicted the victim's testimony at trial and other statements she made to the State's witnesses. 242 N.J. 48, 71–72 (2020).

The Hedgespeth Court concluded the trial court's ruling that the State could impeach the defendant with his two prior convictions was harmful error and explained:

> The key testimony against defendant was that of two police officers who testified that they saw the gun in defendant's waist band and that a gun was later recovered by other officers near where defendant and others were apprehended. The State introduced the gun itself into evidence; however, there was no fingerprint or DNA evidence on the gun.
>
> Had the trial court not erroneously admitted the prior convictions, defendant argues he could have more forcefully challenged the detectives' credibility as to whether they saw the gun on his waistband. By not testifying, defendant was only able to cast doubt on the officers' accounts through cross-examination; he was unable to effectively offer a counter theory of the case. Moreover, the jury was not able to consider Hedgespeth's demeanor and credibility in delivering his theory of the case.

No doubt, the strongest evidence against defendant is that the State produced the gun in evidence.  But, without indisputable evidence <u>linking</u> defendant to the gun — except through officer testimony — the admission of the gun did not necessarily cement the State's case against defendant.  <u>The mere fact that the State may characterize a potential defense theory seeking to explain away the gun as "implausible" is not reason to hold that the trial court's error was harmless</u>.  Determining implausibility "is in the sole province of the jury.  Judges should not intrude as the thirteenth juror."

[249 N.J. at 252–53 (first and third emphases added) (quoting <u>Scott</u>, 229 N.J. at 485).]

We apply these principles to the facts in this case and conclude "the jury's failure to hear defendant's testimony could have produced an unjust result."  <u>Id.</u> at 252.

Before us, the State contends the trial judge's evidentiary ruling permitting the impeachment of defendant using his six prior convictions, only one of which was entered within twenty years of the trial, was harmless beyond a reasonable doubt.  The State contends defendant's claim that he was in the house on an earlier date to purchase drugs was belied by the presence of his DNA in two different rooms in the house, including on an orange juice container in a second-floor bathroom wastebasket, i.e., the floor where the homicide and other crimes largely occurred.

Undoubtedly, the forensic evidence placing defendant at the scene of the crimes was powerful.  See, e.g., State v. Pickett, 466 N.J. Super. 270, 306 (App. Div. 2021) (recognizing "DNA evidence is powerful and compelling").  But it was the only evidence linking defendant to the crimes, and one only needs to read the prosecutor's summation to understand there was no other corroborating evidence tying defendant to the commission of these heinous crimes.

As the Court clearly said in Hedgespeth, the judge's ruling denied defendant an opportunity "to effectively offer a counter theory of the case," something particularly important given the State's forensic evidence, and the "implausibility" of defendant's potential testimony is not for us to judge.  249 N.J. at 252.  We are therefore compelled to reverse defendant's convictions and remand the matter for a new trial.  Our disposition does not require us to address defendant's sentencing arguments.

Reversed and remanded for a new trial.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5670-18